UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| United States of America,<br>　　　　　　　　　　Plaintiff,<br><br>　　　v.<br><br>Larry Donell Riley, Jr.,<br><br>　　　　　　　　　　Defendant.<br>_____ | Case No. 9:23-cr-00460-BHH-4<br><br>**<u>Opinion and Order</u>** |

This matter is before the Court on Defendant Larry Donell Riley, Jr.'s ("Defendant") motion to suppress evidence. (ECF No. 158.) On May 15, 2024, the Government filed a response in opposition. (ECF No. 165.) The Court held an evidentiary hearing on June 18, 2024, to consider Defendant's motion. Having now considered all the briefs and the evidence presented at the hearing, Defendant's motion is now ripe for review. For the reasons set forth below, the Court denies Defendant's motion.

## FACTUAL FINDINGS[1]

Beginning in January 2023, the Drug Enforcement Administration ("DEA") and the Jasper County VICE Unit ("VICE Unit")[2] began investigating John Maurice Anderson's

---

[1] When deciding a motion to suppress, the district court may make findings of fact and conclusions of law. *United States v. Stevenson*, 396 F.3d 538, 541 (4th Cir. 2005). During the hearing, "the credibility of the witness and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. McKneely*, 6 F.3d 1447, 1452-53 (10th Cir. 1993) (internal quotation marks omitted). Here, the facts are based on the parties' briefing and exhibits attached thereto, the docket history, Andrew Maisano's testimony (Hardeeville Police Department, Jasper County VICE Unit detective), and Joseph Walker Michaud's testimony (Hardeeville Police Department detective who stopped Defendant's vehicle), which the Court found credible.

[2] The Vice Unit includes officers employed by the Jasper County Sherriff's Office and the Hardeeville Police Department.

("Anderson") drug distribution organization. During a controlled purchase on March 14, 2023, between Anderson and a confidential informant ("CI"), law enforcement connected Defendant to Anderson and the drug-trafficking organization. Specifically, surveillance units observed: (a) a Dodge Charger entering a Love's gas station in Yemassee, South Carolina; (b) the CI receiving a text from Anderson a minute later stating, "he just pulled up, I'm bout to leave";[3] (c) Anderson entering the Dodge Charger and then exiting less than five minutes later and returning to his vehicle; and (d) Anderson leaving the gas station and meeting with the CI wherein Anderson sold the CI ten fentanyl pills and six ounces of methamphetamine.

Surveillance units followed both Anderson's vehicle and the Dodge Charger as they left the gas station. Agents identified the license plate on the Dodge Charger and determined it was registered to Defendant. Agents observed Defendant travel to the Econo Lodge Hotel ("Econo Lodge" or "hotel") located at 19534 Whyte Hardee Boulevard in Hardeeville, South Carolina, park and enter a room on the backside of the hotel, exit fifteen to twenty minutes later, and return to his vehicle and exit the parking lot. Based on their surveillance and the text message from Anderson to the CI, agents believed that Defendant provided the methamphetamine to Anderson. As a result, agents conducted periodic surveillance on Defendant as part of the investigation.

On April 12, 2023, at approximately 9:50 a.m., VICE Unit officers were conducting surveillance on Defendant at the hotel. Defendant's Dodge Charger was parked in front of room 133. At around 11:45 a.m., agents observed Defendant get in his vehicle, exit the parking lot of the hotel, and travel south down Highway 17 into Savannah, Georgia.

---

[3] ECF No. 165-1 at 2.

Defendant arrived at the Oglethorpe Mall and parked next to a black Dodge Ram. The Dodge Ram had a Texas license plate, and agents confirmed that the vehicle was registered to Enterprise Rental Company. Agents then observed Defendant enter the rented Dodge Ram for approximately two minutes before exiting with a brown bag in his hand. The Dodge Ram drove off, and Defendant got back in his vehicle with the brown bag for approximately two minutes, then went inside the mall without the bag for approximately ten to fifteen minutes before returning to his vehicle and driving back to Hardeeville.

As Defendant was entering Hardeeville, VICE Unit officer Detective Andrew Maisano ("Detective Maisano") contacted Hardeeville Police Department officer Detective Joseph Walker Michaud ("Detective Michaud"). Detective Maisano relayed to Detective Michaud what he and the other agents had observed during their surveillance of Defendant since March 14, 2023, and he asked Detective Michaud to conduct a traffic stop on the Dodge Charger.

### April 12, 2023 Traffic Stop

While traveling behind Defendant's vehicle, Detective Michaud observed Defendant activate his passenger side turn signal approximately forty-five feet from his right turn into the entrance to Econo Lodge. Thus, shortly after 1:00 p.m. on April 12, 2023, Detective Michaud initiated a traffic stop on Defendant's vehicle for improper use of a turn signal. (*See* S.C. Code § 56-5-2150(B) (2023) ("A signal of intention to turn or move right or left when required shall be given continuously during not less than the last one hundred feet traveled by the vehicle before turning.").) Defendant continued driving into the hotel parking lot and parked in front of room numbers 133 and 134 on the

backside of the hotel. Once parked, Detective Michaud approached Defendant at approximately 1:08 p.m. and advised Defendant of the reason for the stop. Detective Michaud also requested Defendant's license, registration, and proof of insurance. Defendant provided his license and registration, but he was unable to produce proof of insurance. While speaking with Defendant, Detective Michaud observed Defendant's left hand visibly shaking and an odor of burnt marijuana emanating from either Defendant or the interior of the vehicle. Detective Michaud asked Defendant where he was coming from, and Defendant stated he was coming from Savannah after having his tires checked. Based on the information relayed to him earlier from Detective Maisano, Detective Michaud suspected that Defendant's stated reason for being in Savannah was not true. Based on his observations at this point (approximately 1:10 p.m.) and the information from Detective Maisano, Detective Michaud requested further assistance from a K-9 unit. Dispatch informed him that a K-9 unit in Ridgeland, South Carolina would head to his location.

At approximately 1:12 p.m., dispatch reported that Defendant's license was showing "ID only." Detective Michaud approached Defendant at approximately 1:13 p.m. to ask about the "ID only" designation and to inquire as to whether he had located proof of insurance. Defendant had not yet located proof of insurance. Detective Michaud asked Defendant if he would step to the back of his vehicle while the tickets were written. Defendant stated he needed to stay seated to keep his phone charged because his father had just been in a wreck in Hampton, South Carolina. Defendant was also trying to locate his insurance card on his phone. Detective Michaud allowed Defendant to stay in his vehicle.

4

At approximately 1:18 p.m., Detective Michaud returned to his vehicle to start writing the tickets and to try and confirm Defendant's license through the Department of Motor Vehicles. At approximately 1:21 p.m., Detective Michaud finished writing the first ticket for improper turn. At approximately 1:22 p.m., Detective Michaud reproached Defendant to check on the proof of insurance issue. Defendant had located an insurance card, but it was expired. Defendant was still actively searching on his phone for a valid proof of insurance card, but he was having issues with his phone turning on and off. Detective Michaud offered for Defendant to use his phone to call the insurance company. At this point in the stop, approximately 1:25 p.m., Sergeant Ager and K-9, Bali, arrived on scene.

Detective Michaud advised Defendant that Sergeant Ager was going to conduct a free air sniff of his vehicle. In response, Defendant appeared nervous and frustrated and asked for the reason for the stop. During the free air sniff, K-9 Bali alerted to the driver's side door. Thereafter, Defendant's vehicle was searched and a brown bag – consistent with the bag Detective Maisano had relayed prior to the stop – containing a clear gallon-sized zipper bag with a large quantity of suspected methamphetamine[4] inside was located on the front passenger floorboard. Defendant was placed under arrest for trafficking methamphetamine.

### Search of Defendant's Hotel Room

Detective Michaud relayed what had occurred during the stop and search of Defendant's vehicle to Detective Maisano. Detective Maisano drafted a search warrant for Defendant's hotel room. (*See* ECF No. 165-2 at 6-19.) After searching Defendant's

---

[4] The substance confiscated from Defendant's vehicle was later confirmed to be 504 grams of methamphetamine.

hotel room, agents located suspected methamphetamine and cocaine,[5] as well as a pistol, ammunition, scales, measuring jars, and identifying documents bearing Defendant's name. (ECF No. 165-2 at 1-5.)

Based upon the above, on June 14, 2023, a federal grand jury returned an indictment charging Defendant with: (1) conspiracy to distribute 50 grams or more of methamphetamine, a quantity of cocaine, and a quantity of a mixture or substance containing a detectable amount of methamphetamine; (2) aiding and abetting the distribution of 50 grams or more of methamphetamine; (3) possession with intent to distribute 50 grams or more of methamphetamine, a quantity of cocaine, and a quantity of a mixture or substance containing a detectable amount of methamphetamine; (4) being a felon in possession of firearm and ammunition; and (5) possession of a firearm in furtherance of and during and in relation to a drug trafficking crime. (ECF No. 3.)

## LEGAL STANDARD

The Fourth Amendment protects citizens against unreasonable searches and seizures. *See* U.S. Const. Amend. IV. "The essential purpose of the proscriptions in the Fourth Amendment is to impose a standard 'reasonableness' upon the exercise of discretion by government officials, including law enforcement agents, in order 'to safeguard the privacy and security of individuals against arbitrary invasions . . . .'" *Delaware v. Prouse*, 440 U.S. 648, 653-54 (1979) (quoting *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 312 (1978)). "[S]earches and seizures 'conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under

---

[5] The substances confiscated from Defendant's hotel room were later confirmed to be 12.397 grams of methamphetamine and 50.3 grams of cocaine.

6

the Fourth Amendment—subject only to a few specifically established and well delineated exceptions.'" *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (citations omitted).

"The exclusionary rule 'generally prohibits the introduction at criminal trial of evidence obtained in violation of a defendant's Fourth Amendment rights . . . .'" *United States v. Stephens*, 764 F.3d 327, 335 (4th Cir. 2014) (quoting *Pennsylvania Bd. of Prob. & Parole v. Scott,* 524 U.S. 357, 359 (1998)). "[T[he exclusionary rule is not a 'strict liability regime,' and exclusion of evidence has 'always been [the] last resort, not [the] first impulse.'" *Id.* (internal citations omitted). At a suppression hearing, the Government bears the burden of proving a search or seizure did not violate the Fourth Amendment. *See United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974). "[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence." *Id.*

### DISCUSSION

Defendant contends that all the evidence seized in his case, both from his vehicle and his hotel room, should be suppressed because law enforcement "lacked probable cause or reasonable suspicion to seize [him]" and unlawfully prolonged the traffic stop without reasonable suspicion in order for the K-9 unit to arrive. (ECF No. 158 at 6-7.) The Court disagrees.

### Vehicle

"It is well established that the '[t]emporary detention of individuals during the stop of an automobile by the police . . . constitutes a 'seizure,' no matter how brief the detention or how limited its purpose." *United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008) (citations omitted). But "[b]ecause an ordinary traffic stop is more analogous to an

7

investigative detention than a custodial arrest, we analyze the propriety of a traffic stop using the dual inquiry announced in the Supreme Court's holding in *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968)." *United States v. Green*, 740 F.3d 275, 279 (4th Cir. 2014).

That inquiry asks, "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20. First, Defendant contends that Detective Michaud did not have justification to initiate the stop for improper use of a turn signal in part because the initial stop was pretextual. (ECF No. 158 at 1.) At the hearing, Defendant's counsel suggested that a drug interdiction operation was being conducted and that the officers were not truly interested in investigating traffic violations. (*See* Tr. 39:18-40:15.)[6]

"As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 809-10 (1996) (citing *Delaware v. Prouse*, 440 U.S. 648, 659 (1979)). And "[o]bserving a traffic violation provides sufficient justification to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop." *Branch*, 537 F.3d at 335. Notably, whether a traffic stop is reasonable "is an objective standard. The standard is met, therefore, when officers observe a traffic violation, regardless of their true, subjective motives for stopping the vehicle." *United States v. Johnson*, 734 F.3d 270, 275 (4th Cir. 2013) (internal citations omitted). Thus, "[a]ny ulterior motive a police officer may have for making the traffic stop is irrelevant."

---

[6] Citations to the June 18, 2024, hearing are drawn from the court reporter's rough draft of the transcript.

*Vaughn v. Whitfield*, No. 8:12-CV-2405-RMG, 2013 WL 5144751, at *3 (D.S.C. Sept. 12, 2013) (citing *United States v. Digiovanni,* 650 F.3d 498, 506 (4th Cir.1992)).

Here, Detective Michaud observed Defendant activate his turn signal approximately forty-five feet before turning into the Econo Lodge, instead of the required one hundred feet as set forth in S.C. Code § 56-5-2150 (2023). (ECF No. 165-3 at 3; Tr. 21:13-22:9.) He visually determined that Defendant signaled far less than one hundred feet before turning by using a city light pole as a reference point, which was erected on the shoulder between the Quality Inn and Econo Lodge entrances. (*Id; see also* ECF No. 158-1 at 1-5.) The Court finds Detective Michaud's testimony credible. Thus, regardless of whether law enforcement officers subjectively hoped to find evidence of other crimes, Detective Michaud observed a traffic violation. Therefore, the initial traffic stop was reasonable for purposes of analysis under the Fourth Amendment. *See Vaughn v. Whitfield*, No. 8:12-CV-2405-RMG, 2013 WL 5144751, at *11 (D.S.C. Sept. 12, 2013) ("[T]he temporary detention of an individual in the course of a routine traffic stop is reasonable *per se,* when probable cause exists to believe that a traffic violation has occurred.")

As to the second part of the inquiry regarding the scope of the officer's actions, "[l]ike a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (internal and external citations omitted). Defendant argues that "Michaud purposefully and unlawfully dragged out the seizure in order for the K-9 unit to arrive. Michaud stated he had already written the warning, therefore there was no justification to

9

prolong the traffic stop just so the dog can get there from another town." (ECF No. 158 at 7.)

As set forth in the findings of fact section and supported by the body camera evidence,[7] while Detective Michaud completed writing a ticket for improper turn by 1:21 p.m., he had not yet completed writing a ticket for no proof of insurance when Sgt. Ager and K-9 Bali arrived on the scene at 1:25 p.m. Indeed, the evidence reflects that Defendant was still actively trying to locate a valid proof of insurance card on his phone at 1:25pm. Thus, given that there were two warning tickets, not one, it is not entirely clear to the Court exactly at what point in time during the stop Defendant contends the stop was unlawfully delayed.

In any event, after a thorough review of the evidence, the Court finds no unconstitutional delay to allow for the arrival of the K-9 unit. Rather, up until the arrival of the K-9unit, Detective Michaud's actions were consistent with ordinary inquires and actions of a traffic stop or related safety concerns. *See Rodriguez*, 575 U.S. at 355 ("[O]rdinary inquiries incident to [the traffic] stop," include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."). Further, Detective Michaud was authorized to ask Defendant to exit the vehicle. *See Pennsylvania v. Mimms,* 434 U.S. 106, 111, n.6 (1977) ("[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures.") The body cam evidence indisputably shows that Detective Michaud was

---

[7] *See* ECF No. 165-4.

in the midst of determining whether Defendant could procure valid proof of insurance on his phone when the K-9 unit arrived on the scene – less than twenty minutes into the stop. *See United States v. Podbielski*, No. 22-4084, 2023 WL 4888866, at *6 (4th Cir. Aug. 1, 2023) (stating that "the purpose of a traffic stop is to 'ensur[e] that vehicles on the road are operated safely and responsibly'" (citing *Rodriguez*, 575 U.S. at 355)). It is further evident that any delay in resolving this issue was not due to law enforcement's actions but was the product of Defendant's own actions. Indeed, on more than one occasion, Detective Michaud offered a possible solution to Defendant to help him more quickly obtain a copy of his insurance card. In other words, the Court finds no evidence to support that law enforcement unnecessarily prolonged Defendant's detention while awaiting the arrival of the K-9 unit. *See, e.g., United States v. Sharpe*, 470 U.S. 675, 688 (1985) (rejecting "the contention that a 20-minute stop is unreasonable when the police have acted diligently and a suspect's actions contribute to the added delay about which he complains").

However, even assuming *arguendo* that the stop was delayed after the **first** warning ticket was written, the Court finds that any such delay occurred after Detective Michaud had reasonable suspicion of drug trafficking. "A lawful traffic stop 'can become unlawful if it is prolonged beyond the time reasonably required to complete [the] mission' of issuing a warning ticket." *United States v. Bowman*, 884 F.3d 200, 209 (4th Cir. 2018) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). But where the occupants of a vehicle are detained beyond the scope of a routine traffic stop, the officer must be able to articulate "a reasonable suspicion that criminal activity is afoot." *United States v. Brugal*, 209 F.3d 353, 358 (4th Cir. 2000) (citing *Terry*, 392 U.S. at 30). "A reasonable suspicion

11

exists when law enforcement officers possess 'a particularized and objective basis for suspecting the person stopped of criminal activity.'" *United States v. Singh*, 363 F.3d 347, 355 (4th Cir. 2004) (quoting *Ornelas v. United States*, 517 U.S. 690, 696). Thus, "[a] reasonable suspicion is demonstrated when an officer is able to 'point to specific and articulable facts which, taken together with rational inferences from those facts, evince more than an inchoate and unparticularized suspicion or hunch of criminal activity.'" *United States v. Ortiz*, 669 F.3d 439, 444 (4th Cir. 2012) (quoting *Branch*, 537 F.3d at 336.)

The Government contends that, prior to the stop, Detective Michaud had knowledge that Defendant was likely Anderson's supplier for methamphetamine and that Defendant appeared to have participated in a drug transaction in Savannah just before coming back to Hardeeville – and that the brown plastic bag was likely still inside Defendant's vehicle. (ECF No. 165 at 13, 16.) Then, by approximately five minutes into the stop, the Government notes that Detective Michaud had observed numerous factors that suggested, when viewed together based on the Detective's extensive training and experience in criminal interdiction, that drug tracking was afoot. Those factors are: (1) Defendant's left hand was visibly shaking; (2) an odor of burnt marijuana was emanating from either Defendant or the inside of the vehicle; (3) Defendant was hesitant to make eye contact; and (4) Defendant lied about going to Savannah to have his tires fixed. Then, just a few more minutes into the stop, at approximately 1:14pm, Defendant refused to exit his vehicle while the tickets were written.

"In reviewing police action, courts must look at whether the evidence as a whole establishes reasonable suspicion rather than whether each fact has been individually

refuted, remaining mindful of 'the practical experience of officers who observe on a daily basis what transpires on the street.'" *Bowman*, 884 F.3d at 213 (quoting *Branch*, 537 F.3d at 336-37). The Court is not persuaded that a shaky hand or the failure to make eye contact, each taken in isolation, supplies an officer with reasonable suspicion. *See Bowman*, 884 F.3d at 215 (stating that "mere nervousness 'is of limited value to reasonable suspicion analyses'" (quoting *United States v. Massenburg*, 654 F. 3d 480, 490 (4th Cir. 2011))); *id.* ("There is nothing intrinsically suspicious or nefarious about the occupant of a vehicle not making eye contact with an officer during a traffic stop.") However, in addition to these primarily innocuous factors, Detective Michaud was informed of Defendant's interaction with Anderson on May 14, 2023, had reason to doubt the veracity of Defendant's stated reason for being in Savannah, and had reason to suspect that there were drugs in his vehicle. Detective Michaud noted in his report and testified credibly at the hearing that he observed an odor of marijuana from either Defendant or the interior of the vehicle. (ECF No. 165-3 at 3; Tr. 24:9-14.) Significantly, the Fourth Circuit "has held that the odor of marijuana, ***by itself***, can establish . . . probable cause" – a more demanding standard than reasonable suspicion.[8] *United States v. Muti*, No. 4:09-CR-41-FL1, 2009 WL 3296091, at *2 (E.D.N.C. Oct. 13, 2009) (emphasis added). *See United States v. Kellam,* 568 F.3d 125, 136 (4th Cir. 2009) (upholding a search based on probable cause when the officer smelled marijuana); *United States v. Scheetz,* 293 F.3d 175, 184 (4th Cir. 2002) (holding probable cause to search the vehicle existed given the "odor of marijuana emanating from the interior of the car").

---

[8] *See Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (noting that reasonable suspicion standard is less demanding than the probable cause or preponderance of the evidence standards).

13

The Court finds that, considered together, these factors coupled with the practical experience of officers who observe drug trafficking methods would "eliminate a substantial portion of innocent travelers." *United States v. Williams*, 808 F.3d 238, 246 (4th Cir. 2015). *Cf. United States v. Williams*, 321 F. Supp. 3d 594, 609 (D.S.C. 2018) (holding that Corporal Miller did not have reasonable suspicion to prolong the traffic stop and noting the ***absence*** of any testimony by Corporal Miller that he smelled marijuana emanating from defendant's car, that defendant appeared nervous, or that defendant lied during the traffic stop). Thus, the Court holds that any alleged delay after Detective Michaud completed writing the first warning ticket occurred after Detective Michaud had reasonable suspicion of drug trafficking and was, therefore, constitutional.

Moreover, to the extent Defendant is also contending that the free-air dog sniff unconstitutionally prolonged the stop, this claim is equally rejected because the dog sniff also occurred after Detective Michaud obtained reasonable suspicion of drug trafficking. *See United States v. Hill*, 852 F.3d 377, 382 (4th Cir. 2017) (stating that a "sniff . . . may not prolong the duration of the traffic stop ***absent*** consent of those detained or ***reasonable suspicion*** of criminal activity") (emphasis added).

### Hotel Room

The body cam evidence reflects that, at approximately 1:28 p.m., the K-9 drug dog, Bali, alerted to the driver side door of Defendant's vehicle.[9] The alert by a K-9 drug dog

---

[9] The Court notes that Defendant does not challenge the positive alert of the K-9 dog in his motion to suppress. (*See generally* ECF No. 158. *See also* ECF No. 165 at 18 (Government noting in its brief that "the defendant does not challenge the positive alert of the K9").) At the hearing, counsel for Defendant expressed that he thought this issue was raised, but he ultimately confirmed on the record that it was not asserted in Defendant's motion to suppress. Although no binding precedent establishes the proper "alert" standard for a drug detection dog, whether a dog alert is a question of fact for this Court to resolve. *See United States v. Mason*, 628 F.3d 123, 130 (4th Cir. 2010). While not properly before the Court, out of an abundance of caution, the Court finds that the Government presented sufficient evidence

14

to the presence of narcotics provided probable cause to search the vehicle. *Branch*, 537 F.3d at 335, 340 n.2. Law enforcement's physical search of Defendant's vehicle revealed a brown plastic bag in the front passenger floorboard containing a clear gallon-sized plastic zipper bag with suspected methamphetamine inside. Law enforcement then obtained a search warrant for Defendant's hotel room, wherein officers located suspected drugs, drug paraphernalia, a pistol, and ammunition. (*See* ECF No. 165 at Ex. 2 at 6-14.)

Defendant asserts one argument in his Motion for why the Court should suppress the evidence seized from his hotel room. He contends that "[s]ince the Government learned about the hotel room and unlawfully seizing [sic] drugs from Mr. Riley's vehicle during the unlawful detention past the purpose of the stop, the evidence seized as a resul[t] of a search warrant must likewise be suppressed." (ECF No. 158 at 7.) Because the Court finds that the traffic stop and search of Defendant's vehicle was lawful, for all the reasons just discussed, it finds no merit to Defendant's argument for suppressing the evidence seized from his hotel room.

## CONCLUSION

For the foregoing reasons, Defendant's motion to suppress (ECF No. 158) the evidence in the charges pending against him is **DENIED.**

**IT IS SO ORDERED.**

        /s/ Bruce Howe Hendricks
United States District Judge

July 11, 2024
Charleston, South Carolina

---

at the hearing to support that Bali positively alerted to Defendant's vehicle. (*See* ECF No. 4 at approximately 1:29 p.m. (Bali's change in behavior and audible whine as soon as Bali is near the driver's side door).)